**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: L.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1420 WDA 2023 |

Appeal from the Order Entered September 19, 2023
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-067-2022

BEFORE:   KUNSELMAN, J., BECK, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED: May 14, 2024**

L.H. ("Mother") appeals from the September 19, 2023 order entered by the Court of Common Pleas of Allegheny County granting the petition filed by the Allegheny Office of Children, Youth and Families ("CYF") seeking the involuntary termination of Mother's parental rights to her biological daughter, N.G. ("Child"), born in December 2016.[1]  After careful review, we affirm.

From the time of her birth in December 2016 to May 2020, Child was in Mother's sole custody.  Notes of Testimony (N.T.), Termination Hr'g, 9/15/23, at 81.  CYF has an extensive history of involvement with Mother as a result of numerous referrals regarding Child and her three half-siblings beginning as

---

[*] Former Justice specially assigned to the Superior Court.
[1] The same order involuntarily terminated the parental rights of Child's biological father, W.G. ("Father").  Father has also filed an appeal which this Court has resolved in a separate decision docketed at 1294 WDA 2023.

early as 2014.[2]   N.T. at 82-83. Although Child was removed from Mother's care by CYF for a short period of time at the time of her birth, Child was returned to Mother's care.  N.T. at 83.

On May 29, 2020, CYF obtained an emergency custody authorization (ECA) for Child after police found Mother intoxicated while caring for Child. N.T. at 86-87.  Mother admitted she had shaken Child and threatened her. N.T. at 86-87, 125.  Mother told caseworkers that she did not want Child back if she had been placed in foster care, likening these circumstances to a mother animal who rejects her young after it has come into contact with humans. N.T. at 87. CYF placed Child into kinship care with T.W. ("Foster Mother").[3]

Child was adjudicated dependent on June 17, 2020.  N.T. at 88.  Foster Mother was appointed Child's secondary medical and dental decision maker on September 23, 2020.  N.T. at 88.  After Child's removal from Mother's custody, Child remained in the same placement with Foster Mother, who wishes to adopt Child.  N.T. at 88.

_____

[2] Child's three half-siblings through Mother are J.P. (born in 2011), K.B. (born in 2014), and X.G. (born in 2022).  N.T. at 82.  In 2014, CYF became involved with Mother after newborn K.B. was brought to a local hospital with an unexplained femur fracture.  N.T. at 83.  Mother's parental rights to K.B. were subsequently terminated in 2016.  N.T. at 83.  In 2018, another referral led to J.P. being placed in kinship care; J.P. has been placed with a permanent legal guardian.  N.T. at 83-84.  In 2022, CYF received a referral for X.G. at the time of his birth, reporting concerns that Mother lacked an ability to care for the child and had substance abuse issues.  N.T. at 84-85.
[3] While Father's whereabouts were initially unknown, CYF later ascertained that Father was incarcerated.  N.T. at 87, 115.  CYF staff reported that on July 7, 2022, Father was sentenced to thirty-five to seventy years' imprisonment on felony drug charges.  N.T. at 115-116.

Mother was given several court-ordered goals including participating in mental health treatment, undergoing substance abuse treatment, submitting to drug screenings, participating in visitation, obtaining appropriate housing, and cooperating with CYF. N.T. at 91. Mother was also required to submit to the recommendations of Dr. Patricia Pepe, Ph.D., a licensed psychologist who conducts forensic evaluations of parents and children in dependency proceedings. N.T. at 4, 91.

On May 22, 2022, CYF filed petitions to terminate the parental rights of both Mother and Father pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8) and (b). On August 4, 2022, the trial court entered an order appointing Andrea Spurr, Esq. as Child's counsel to represent her legal interests in the termination hearing. *See* Order, 8/4/22, at 1.[4]

_____

[4] Section 2313 of the Adoption Act provides that:

> The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. The court may appoint counsel or a guardian *ad litem* to represent any child who has not reached the age of 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child.

23 Pa.C.S.A. § 2313(a). Our Supreme Court has held that with respect to contested involuntary termination of parental rights ("TPR") proceedings, Section 2313 requires a trial court to "appoint an attorney to represent the Child's legal interests, *i.e.*, the child's preferred outcome." **In re T.S.**, 648 Pa. 236, 239–40, 192 A.3d 1080, 1082 (2018) (citing **In re Adoption of L.B.M.**, 639 Pa. 428, 161 A.3d 172 (2017)). Further, the Supreme Court has provided that "appellate courts should engage in limited *sua sponte* review of whether children have been afforded their statutory right to legal counsel
*(Footnote Continued Next Page)*

At the September 15, 2023 termination hearing, Mother and Father testified telephonically and were represented by separate counsel. Child, who was six years old at the time of the hearing, was not present but was represented by her legal counsel, Atty. Spurr.

CYF presented the testimony of Rachael Alanskas, CYF caseworker, who admitted that Mother complied with some of her goals by attending the permanency review hearings and CYF conferences, completing parenting programs, and participating in dual diagnosis programs for drug and alcohol treatment and mental health treatment. N.T. at 89-96.

While Mother initially was given unsupervised visits with Child in her home, in February 2022, Mother was restricted to having supervised visits at CYF. N.T. at 110-12. Ms. Alanskas reported that Mother's visitation rights were restricted for multiple reasons including reports of Mother allowing unknown males to be present for visitation, Mother's resistance to having her home assessed, and continued drug and alcohol concerns. N.T. at 111. On one occasion, Mother complained about having to feed Child during the

_____

when facing the potential termination of their parents' parental rights." **In re Adoption of K.M.G.**, 663 Pa. 53, 87, 240 A.3d 1218, 1238 (2020).

In this case, the orphans' court appointed conflict counsel Andrea Spurr to represent Child's legal interests in the termination hearing. Atty. Spurr did not previously serve in this case as a guardian *ad litem* or in any other capacity which would present a potential conflict in her role as legal counsel.

We also observe that the Supreme Court has noted that the Adoption Act does not require the appointment of a guardian *ad litem* in contested TPR proceedings, as "per the General Assembly's directive [in Section 2313], no attorney is assigned to represent the child's best interests." **In re Adoption of L.B.M.**, 639 Pa. at 443 n. 14, 161 A.3d at 181, n. 14.

visitation period. N.T. at 111. On another occasion, visitation was canceled because Mother appeared intoxicated. N.T. at 113. Mother completed nine visits with Child in 2022, and seven visits in 2023. N.T. at 114.

Ms. Alanskas's primary area of concern was Mother's mental health. Mother's self-reported diagnoses of schizophrenia, Post-Traumatic Stress Disorder (PTSD), and depression were confirmed by mental health treatment providers and Dr. Pepe. N.T. at 102. Ms. Alanskas indicated that Mother has exhibited strange and concerning behavior in the presence of CYF staff. Mother has fixations on events that she believes are happening and believes that people are out to kill her, including CYF staff. N.T. at 98. Mother made threats to Ms. Alanskas, telling her to "watch out." N.T. at 98.

Mother often obsessed about her belief that Child had a rash on her private areas and suggested that she was not receiving proper care in foster care and/or was being abused. N.T. at 98. Mother's strong fixation would cause her to do repeated inappropriate body checks of Child, in which she would take pictures of Child's private areas and send them to CYF. N.T. at 106, 112-13, 115.

In response, CYF had Child medically examined, which confirmed that she did not have a rash. N.T. at 27, 106-107. CYF also investigated Mother's allegation that Child was being sexually abused in her foster home, but the claims were determined to be unsubstantiated. N.T. at 107. Although Child initially exhibited sexualized behaviors uncommon for a child her age, Child's

sexualized behaviors decreased and stopped all together once Mother's contact with Child was restricted to supervised visits at CYF. N.T. at 107-108.

CYF also investigated Mother's claim that Child had been physically abused in her foster home. N.T. at 138. Foster parents admitted that Foster Father gave Child a spanking on her buttocks for bad behavior. CYF determined this was an isolated incident and was not concerned with Child's continued placement with Foster Parents, who have been more educated and equipped to handle Child's behavioral problems and understand that corporal punishment is not permissible in foster homes. N.T. at 50-51, 139.

As the dependency proceedings progressed, Mother began to deny her schizophrenia diagnosis, stopped taking her medication, and has been inconsistent in receiving treatment. N.T. at 102-103. Mother stopped attending her dual diagnosis program in May 2022 and expressed confusion over why she needed to continue with mental health treatment after she completed therapy programs. N.T. at 104-105. Mother also stopped complying with her requirement to participate in drug screenings and missed thirty-four drug screens between October 2022 and the termination hearing.

Ms. Alanskas also shared her concerns with Mother's ability to meet Child's needs based on a history of medical and dental neglect, given that at the time of her placement Child exhibited extensive dental problems and had not been taken for dental care. N.T. at 10, 108. Ms. Alanskas also noted that Mother had a significant history with the agency which had received reports

inappropriate discipline of her older children, who were eventually removed from her care.  N.T. at 108.

While Mother has stable housing, CYF staff was concerned with the living environment Mother has created with her husband, who has exhibited signs of significant drug and alcohol abuse and has appeared severely impaired on multiple occasions.[5]  N.T. at 99-101.  Mother's husband refuses to submit to drug screening and Mother does not believe her husband has any problems with substance abuse.  N.T. at 101.

CYF also presented the testimony of Dr. Pepe, who conducted several evaluations of Mother and separate interactional sessions between Child and Mother as well as with Child and Foster Parents.  In her individual session with Mother, Dr. Pepe indicated that Mother experiences auditory hallucinations, paranoid ideation, and irrational thinking.  N.T. at 16.  Dr. Pepe noted that Mother suffers from confabulation in which an individual will change their memories to suit what their beliefs are and cannot accurately perceive reality. N.T. at 17.  Dr. Pepe noted Mother's paranoia and social isolation as Mother told Dr. Pepe that she did not have any friends because she could not trust anyone but herself.  N.T. at 16-17.

Given Mother's diagnosis and presentation of significant symptoms of the disorder, Dr. Pepe opined that Mother needed consistent treatment in partial hospitalization or intensive outpatient program as well as meeting with

---

[5] Mother's husband's initials do not appear in the certified record.

a resource coordinator to assist with medication compliance. N.T. at 23-24, 51-52. Dr. Pepe reported that Mother appeared to be controlled by her schizophrenia in that she was not able to function in a meaningful manner on a daily basis. N.T. at 26.

Dr. Pepe admitted that when she met with Mother again in September 2022, Mother appeared to be more coherent and could be described as being in "partial remission" of her symptoms of schizophrenia. N.T. at 31. However, Dr. Pepe explained that schizophrenia is not a disorder that "suddenly stops," but a lifelong psychiatric disturbance in which an individual has waxing and waning symptoms with various levels of functioning. N.T. at 30-31. When asked whether there is a capacity for success for an individual with schizophrenia to parent a child, Dr. Pepe emphasized the importance of the individual's commitment to proper medication management, fruitful therapy appointments, and use of intensive case management resources. N.T. at 33.

Thereafter, when Dr. Pepe met again with Mother in May 2023, Dr. Pepe had continued concerns as Mother exhibited fixations and obsessive thoughts during the evaluation and surmised that Mother was still having hallucinations. N.T. at 46-47, 49. Dr. Pepe administered psychological testing to Mother which revealed an elevated score for schizophrenia which suggested Mother felt alienated by others and exhibited preoccupation with abstract matters while being neglectful of dealing with normal life issues. N.T. at 48.

Dr. Pepe also had the opportunity to observe interactions between Mother and Child and noticed that Child was constantly trying to please Mother

and elicit responses from Mother, who was not actively engaging with Child, but instead was disconnected and alienated from Child. N.T. at 24-25.

Dr. Pepe indicated that Child presented multiple concerns, including that she exhibited sexually provocative behaviors as well as an attachment disorder in which Child presented social disinhibition, in which she was excessively friendly and lacked any sense of stranger anxiety. N.T. at 10-11. Dr. Pepe noted that Child displayed a superficial or disingenuous presence in which she was attempting to create a false self to please other people. N.T. at 11. Dr. Pepe attributed this disorder to Child's role as the daughter of a schizophrenic parent, where the child is not given consistent emotional connection and develops acute anxiety in response to uncertainty in whether the parent will care for the child's needs. N.T. at 11. Dr. Pepe expressed concern for Child's prognosis with her attachment disorder, as she believed that Child required therapy and a stable environment in which the Child's needs were consistently met. N.T. at 14. Dr. Pepe was concerned that Child could become socially isolated if left in Mother's care. N.T. at 26.

In subsequent evaluations of Child, Dr. Pepe noted Child exhibited significant progress after being placed with her Foster Parents. N.T. at 37. Dr. Pepe observed that Child had established primary positive attachments with Foster Parents, who she identified as her mom and dad, and described them as psychological parents who care for and protect her. N.T. at 41, 52. Dr. Pepe noted that Child's decision to change her name to incorporate Foster Parents' last name showed Child's perception that she was an integrated,

valued part of their family. N.T. at 43. Moreover, Dr. Pepe observed that Child had benefited from play therapy and was learning to develop more authentic interpersonal interactions and relationships. N.T. at 52-53.

In evaluating Child's interaction with Mother, Dr. Pepe admitted that Child was spontaneously affectionate with Mother during evaluations. N.T. at 152. However, Dr. Pepe felt that Child did not exhibit dynamics typically reflective of bonding with a parent. N.T. at 35. Dr. Pepe expressed strong concerns that Child would experience regression with her psychological issues and attachment disorder if Mother's parental rights were not terminated. N.T. at 43-44. Dr. Pepe emphasized that Child's need for stability and permanency supports Child's adoption by Foster Parents. N.T. at 36, 44, 51.

Mother testified on her own behalf and emphasized that she was continuing with monthly mental health treatment. N.T. at 162. She explained that she was not able to submit to drug screens due to her work schedule and denied using alcohol. N.T. at 164, 169. Mother claimed that she was unable to visit Child because her caseworker failed to set it up correctly. N.T. at 171. Mother claimed that she would follow all of Dr. Pepe's recommendations, but also claimed that the testimony of Dr. Pepe and Ms. Alanskas were lies. N.T. at 171, 173-74, 179, 191-93. Mother denied shaking Child prior to her arrest that led to Child's placement and indicated she had proof she was not schizophrenic. N.T. at 192-93. Mother again insisted that Child had a rash and again accused Foster Father of spanking Child, which Mother claimed would cause Child lifetime trauma. N.T. at 166-67, 173, 193-95.

At the conclusion of the hearing, the trial court heard closing arguments from counsel for CYF, Mother, and Father, as well as Child's legal counsel, Atty. Spurr. Although Atty. Spurr conceded that Child does not "understand the concepts of termination or adoption," Child indicated that she would like to have more visits with Mother. Atty. Spurr characterized Child as "exceptionally bright," advocated for Child's preference, and asked the trial court to consider other permanency options that would allow Child to have ongoing contact with Mother as she desires. N.T. at 215-216.

By order dated September 19, 2023, the orphans' court involuntarily terminated Mother and Father's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). On October 19, 2023, Mother filed a notice of appeal along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The orphans' court filed its Rule 1925(a) opinion on January 8, 2024.

Mother raises the following issues for review on appeal:

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S.[A.] § 2511(a)(2), (5), and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S.[A.] § 2511(b)?

Mother's Brief, at 6.

Our review of involuntary termination decrees "is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, appellate courts must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. *In the Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). An appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id*.

Termination of parental rights is governed by Section 2511 of the Adoption Act. 23 Pa.C.S.A. § 2511. If the orphans' court determines the petitioner established grounds for termination under subsection 2511(a) by clear and convincing evidence, the court must assess the petition under subsection 2511(b), which focuses on the child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). We need only agree with the trial court as to one subsection of Section 2511(a), in addition to Section 2511(b), to affirm an order terminating parental rights. *In re D.L.B.*, 166 A.3d 322, 327 (Pa.Super. 2017) (citing *In re M.M.*, 106 A.3d 114, 117 (Pa.Super. 2014)).

Our analysis in this case will focus upon Section 2511(a)(2) and (b), which provide as follows:

- 12 -

**(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(a)(2), (b).

With regard to termination of parental rights pursuant to Section 2511(a)(2), this Court has held that:

[i]n order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

***In re Adoption of M.E.P.***, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted).

Our review of the record supports the trial court's conclusion that CYF presented sufficient grounds for the termination of Mother's parental rights under Section 2511(a)(2).  In this case, Mother has exhibited a repeated and

continued incapacity to provide for Child's needs. As a result of her schizophrenia, Mother has presented symptoms of hallucinations, fixations, obsessions, paranoia, and an inability to accurately perceive reality. In particular, Mother was so fixated on her unfounded claims of Child having a rash that she repeatedly took pictures of Child's private areas and distributed them to CYF staff. Dr. Pepe observed that Mother was controlled by her disorder, which prevented Mother from functioning in a meaningful manner on a daily basis. N.T. at 26.

In addition, the record substantiates the conclusion that Mother's repeated and continued incapacity has caused Child to be without essential parental care necessary for her well-being. Dr. Pepe diagnosed Child with an attachment order, which she opined was the result of having the lack of a consistent emotional connection with Mother while in an environment of social isolation. Dr. Pepe believed that when Child was in Mother's care, she developed anxiety from being unable to perceive that her needs would be met in an unpredictable environment.

We also agree with the trial court's finding that Mother cannot or will not remedy the issues that led to her inability to parent Child. While Mother has completed some of her court-ordered goals and has submitted to dual diagnosis treatment, the trial court emphasized that Mother has not been consistent with her visitation, drug screenings, or mental health treatment with long breaks of having no therapy at all. The trial court also noted that Mother did not acknowledge a problematic living situation with her husband

- 14 -

who exhibits signs of drug and alcohol abuse. The trial court emphasized that Mother was not able to progress from supervised visitation.

While Mother highlights Dr. Pepe's admission that Mother's symptoms were in partial remission during the dependency proceedings, subsequent testing and evaluation revealed that Mother continued to experience significant psychological symptoms that limited her ability to effectively function in daily life.

The trial court deferred to Dr. Pepe's continued concern about Mother's schizophrenia and her doubt that Mother had the ability to develop and maintain stability to be able to provide what is necessary to meet Child's needs. The trial court agreed Mother's mental health needs had not been appropriately addressed as Mother was in minimal therapy, had denied her schizophrenia diagnosis, and was not managing her schizophrenia with medication. Given that Mother is not consistently seeking assistance in addressing her mental health concerns, the prognosis of the severity of her schizophrenia symptoms is uncertain.

Therefore, we conclude that the trial court did not err in finding sufficient grounds exist for the termination of Mother's parental rights under Section 2511(a)(2). As noted above, to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b), and we, therefore, need not address any further subsections of Section 2511(a). *In re D.L.B.*, 166 A.3d at 327.

We now turn to consider whether involuntary termination was appropriate pursuant to Section 2511(b), which affords primary consideration to the developmental, physical, and emotional needs and welfare of Child. *See* 23 Pa.C.S.A. § 2511(b).  In *Interest of K.T.*, 296 A.3d 1085 (Pa. 2023), our High Court held:

> a court conducting a Section 2511(b) analysis must consider more than proof of an adverse or detrimental impact from severance of the parental bond. We emphasize analysis of the parental bond is but one part of the overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, i.e., whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare.

*Id*. at 1113. In addition, the K.T. Court held that the "Section 2511(b) inquiry must also include consideration of other important factors." *Id.* While not inventing an exhaustive list of considerations, the Court explained that the inquiry must consider and weigh certain evidence if it is present in the record, including, but not limited to,

> the child's need for permanency and the length of time in foster care consistent with 42 Pa.C.S.[A.] § 6351(f)(9); whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability.

*Id*. (footnote omitted).  See also *id.* at n.28.

In this case, the trial court recognized that Child has a bond with Mother and did find that severing the bond will have an adverse effect on Child. Nevertheless, the trial court declared that severing this bond would be in Child's best interests given that Child had developed an attachment disorder

- 16 -

due to the lack of consistent emotional connection with Mother. We also highlight Dr. Pepe's concern that Child would experience regression with her psychological issues if Mother's parental rights were not terminated.

Concomitantly, the trial court recognized that Child shares a strong parental bond with Foster Parents, who she calls Mom and Dad. Orphans' Court Opinion (O.C.O), 1/8/24, at 9; N.T. at 124. The trial court also noted that Child has an attachment to her siblings in her foster home, which includes a biological sibling.

The trial court emphasized Dr. Pepe's findings that upon observing an interactional evaluation between Foster Mother and Child, Foster Mother was committed to the Child, "exhibited positive and appropriate parenting skills and had a very good understanding of [Child]." O.C.O. at 6. Foster parents have ensured that Child participates in therapy and have arranged appropriate medical and dental care for Child, who had extensive dental problems upon her placement. N.T. at 10. The trial court found that "[t]he stable environment provided by the Foster parents has allowed [Child] to thrive." O.C.O. at 9. The orphans' court highlighted that Foster Parents wish to adopt Child. *Id.* at 15. Child's need for stability and permanency has been met in her foster home where she has remained since her removal from Mother's custody in May 2020.

Accordingly, we discern no abuse of discretion by the court in concluding that terminating Mother's parental rights serves the developmental, physical,

and emotional needs and welfare of Child.  Thus, we affirm the order pursuant to Section 2511(a)(2) and (b).

Order affirmed.

Judge Kunselman did not participate in the consideration or decision of this case.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 05/14/2024